**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 18, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARK G. ANDERS,

      Plaintiff - Appellant,

v.

NANCY A. BERRYHILL,[*]
Acting Commissioner of Social Security,

      Defendant - Appellee.

No. 15-4181
(D.C. No. 2:14-CV-00610-EJF)
(D. Utah)

_____

**ORDER AND JUDGMENT**[**]
_____

Before **MATHESON**, **McKAY** and **O'BRIEN**, Circuit Judges.
_____

Mark Anders appeals from the district court's judgment affirming the

Commissioner's denial of his application for disability insurance benefits.

Exercising jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291, we affirm.

_____

[*] In accordance with Rule 43(c)(2) of the Federal Rules of Appellate Procedure, Nancy A. Berryhill is substituted for Carolyn W. Colvin as the Acting Commissioner of the Social Security Administration.

[**] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I. BACKGROUND

Anders claimed he was disabled due to fibromyalgia, diabetes, degeneration in both eyes, hepatitis C, chronic back pain, and nerve damage in his neck. His amended, alleged onset date was the date he turned 50 in March 2011. His claim was ultimately denied by an administrative law judge (ALJ) at step five of the familiar five-step sequential evaluation set forth in 20 C.F.R. § 404.1520(a)(4). The ALJ found that although Anders had several severe impairments (diabetes mellitus and degenerative disc and joint disease of the cervical, lumber, and thoracic spine), they did not meet or medically equal one of the impairments listed in 20 C.F.R. Pt. 404, Subpart P, Appendix 1, that are so severe as to preclude employment. As relevant to this appeal, the ALJ found Anders had the residual functional capacity (RFC) to perform a reduced range of unskilled, light work limited to (1) lifting 8.5 pounds occasionally and up to 5 pounds more than occasionally; (2) standing and walking no more than 15 minutes at a time and no more than 6 total hours in an 8-hour workday, with the option to use a cane; (3) sitting no more than 60 minutes at a time and no more than 6 total hours in an 8-hour workday; and (4) work involving no more than frequent near-acuity vision. In addition, the ALJ found Anders needed an option to sit or stand. Given these limitations, the ALJ determined Anders could not return to his past relevant work as a welder.

Because of Anders's RFC, age, and eleventh-grade education, the ALJ concluded she could not rely on the Medical-Vocational Guidelines (commonly referred to as the "grids") to direct a disability determination but instead had to use

2

the grids as a framework. To that end, the ALJ consulted a vocational expert (VE), who opined that with his RFC, Anders could perform several unskilled jobs in the light-exertion category: (1) gluer, (2) cleaner/polisher, and (3) inspector and hand packager. The VE stated there were approximately 50,000 of each job in the national economy, but based on her "experience and study of the jobs," she reduced the number to 10,000 of each job to account for Anders's RFC. Aplt. App., Vol. I at 71.[1] Accepting the cumulative 30,000 jobs in the national economy as a significant number, the ALJ found Anders not disabled at step five. Anders submitted additional evidence to the Appeals Council relating to the numbers of available jobs. The Council determined the evidence would not have changed the outcome and denied his request for review. The district court affirmed, and Anders appeals.

## II. DISCUSSION

Our task in this appeal is limited to determining whether substantial evidence supports the agency's factual findings and whether the agency applied the correct legal standards. *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). We cannot "reweigh the evidence" or "substitute our judgment for that of the agency." *Id.* (internal quotation marks omitted).

---

[1] We cite to the agency transcript page number in our citations to Volumes I through V of the appendix. We cite to Volumes VI and VII of the appendix by the pagination convention adopted in those volumes.

**A.     Deviations from the DOT and the OOH.**

    **1.     Cleaner/polisher job not viable.**

Anders first argues the ALJ erred in relying on the cleaner/polisher job because, according to the Dictionary of Occupational Titles (DOT), that job requires *constant* near-acuity vision whereas the ALJ limited Anders to jobs requiring not more than *frequent* near-acuity vision, and the ALJ did not question the VE about the deviation from the DOT requirement.  The Commissioner concedes error but contends the ALJ properly relied on the other two jobs the VE identified.  Accordingly, we turn to Anders's arguments regarding those other jobs.

    **2.     No deviation from Occupational Outlook Handbook's educational requirement for inspector/hand packagers requiring explanation.**

Anders claims that according to the Occupational Outlook Handbook (OOH), the work of an inspector and hand packager fits within the generic title of "quality control inspectors," and that title requires a high school diploma or equivalent.  Because the ALJ found Anders had only an eleventh-grade education, Anders posits that in identifying the inspector/hand packager job, the VE erred in deviating from the OOH without explanation.  In support, he notes that by regulation, the agency has decided to take administrative notice of "reliable job information available from various governmental and other publications."  20 C.F.R. § 404.1566(d).  The regulation provides five examples of such publications, including both the DOT and the OOH.  *Id.* § 404.1566(d)(1), (5).  Anders observes that under our ruling in *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999), and Social Security Ruling

4

(SSR) 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000), an ALJ is required to obtain a reasonable explanation from a VE for any deviation the VE makes from the DOT. He therefore asks us to reach the same conclusion with respect to the OOH—that an ALJ should have to elicit a reasonable explanation for any conflict between the VE's testimony and the OOH.

We need not reach the underlying question—whether the agency must (or should) take notice of the OOH and explain any deviation from its description of educational requirements for a particular job. Instead, we may assume, for purposes of this issue only, that the agency must do so because we see no deviation in need of an explanation. The OOH's generic title of "quality control inspectors" is not an obvious equivalent to the description of the inspector/hand packager job the VE identified from the DOT.

The DOT describes that job as involving the inspection and packaging of molded plastic products:

> Inspects molded plastic products, such as bottle caps or tops, for defects, and packs inspected products into shipping cartons: Visually examines molded products for defects, such as scratches, discoloration, and flash, and discards defective products. Packs inspected product in cartons according to customer specifications, and carries cartons to storage area. May attach metal bands to bottle tops prior to packing to form necks for bottles and measure necks to ensure specified length, using gauge.

DOT 559.687-074, 1991 WL 683797 (emphasis omitted). In contrast, the OOH describes positions that require testing products: "Although a high school diploma is enough for the basic testing of products, complex precision-inspecting positions are typically filled by more experienced workers." Aplt. App., Vol. VI, at 19-2 000140;

5

*see also id.* (stating a high school diploma and in-house training are generally sufficient for quality control inspectors who conduct "simple pass/fail tests of products," many of whom "work in medical or pharmaceutical labs").  The DOT description does not refer to testing any products but only to visual inspection of simple molded plastics.  *Id.*  The OOH also states "[c]andidates for inspector jobs can improve their chances of finding work by studying industrial trades in high school or in a postsecondary vocational program," or by performing "[l]aboratory work in the natural or biological sciences."  *Id.*  The OOH also describes a number of "Important Qualities":

> *Math skills.*  Knowledge of basic math and computer skills are important because measuring, calibrating, and calculating specifications are major parts of quality control testing.
>
> . . .
>
> *Technical skills.*  Quality control inspectors must understand blueprints, technical documents, and manuals, ensuring that products and parts meet quality standards.

*Id.*

From these descriptions it is clear that the OOH describes a position requiring more skills than the DOT job.  We fail to see how studying an industrial trade in high school or a postsecondary program would enhance the chances of employment as an inspector of molded plastics, and the DOT description does not require any of the math or technical skills described in the OOH.  In fact, the DOT's inspector/hand packager reasoning level is only a "2 – Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems

6

involving a few concrete variables in or from standardized situations." DOT 559.687-074, 1991 WL 683797. In sum, there is an insufficient correlation between the DOT and the OOH for us to say the ALJ was required to elicit a reasonable explanation from the VE why the DOT job of inspector/hand packager does not require a high school diploma or equivalent.

### 3. Deviation from DOT's lifting requirement for light work adequately explained.

According to the DOT, the gluer and inspector/hand packager jobs both require light exertion. Light work is defined by regulation:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). Anders claims the ALJ adduced no persuasive basis for deviating from the lifting requirements of light work when she found he could lift no more than 8.5 pounds occasionally and three to five pounds more than occasionally. He also contends the VE never explained how work that required lifting only 8.5 pounds occasionally, and with standing and walking limited to 15 minutes at a time, would ever be classified as "light" in the DOT.

We see no error. As we will discuss in Section II.B., *infra*, Anders's RFC corresponded with a reduced range of light work, not with, as Anders seems to imply,

7

sedentary work, which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," 20 C.F.R. § 404.1567(a). And the ALJ asked the VE whether the DOT gave the same level of detail the ALJ gave in the hypothetical to the VE that contained the same limitations as the ALJ's eventual RFC finding. The VE responded it did not and she had reduced the numbers by 80% to account for all the limitations, *see* Aplt. App., Vol. I at 71, not just the sit/stand option, as Anders suggests, *see* Aplt. Opening Br. at 35. Anders's attorney specifically asked the VE if "the lifting limitation being in a range not occasionally ten pounds but between eight and a half and ten pounds, variable on the day," would erode the number of jobs in the light-exertional category. Aplt. App., Vol. I at 73. The VE responded it would.

Hence, the VE was asked about the deviation from the DOT and drew on her own education and experience in determining the erosive effect the specific limitations had on the number of jobs she identified. That was entirely permissible. *See Haddock*, 196 F.3d at 1091-92 (explaining that a "valid explanation" by a VE for a conflict with the DOT is "that a specified number or percentage of a particular job is performed at a lower RFC level than the [DOT] shows the job generally to require"); SSR 00-4p, 2000 WL 1898704, at *2 (listing the VE's experience among the bases for reasonable explanations for conflicts with the DOT). As required by SSR 00-4p, *see* 2000 WL 1898704, at *4, the ALJ explained in her decision how she resolved the conflict with the DOT: "[T]he expert stated that her education and experience indicates that such jobs do allow for such limitations, in the reduced

8

numbers . . . . The expert's resume is found in the file. No contrary evidence was presented." Aplt. App., Vol. I at 30. Accordingly, we reject Anders's argument.

### B. The ALJ was not required to use the sedentary exertional table in the "grids" and find Anders disabled.

Anders next points to one of the agency's internal policies set forth in its Program Operations Manual System (POMS).[2] The POMS defines the term "significant erosion" as a "considerable reduction in the available occupations at a particular exertional level" and states when there is such a reduction, an adjudicator should "[g]enerally[] use a lower exertional rule [in the Medical-Vocational Guidelines] as a framework for a decision." POMS DI 25001.001.B.72. Anders asserts the 80% erosion in the numbers of jobs the VE said he could perform with his RFC for less than the full range for light work is a significant erosion or considerable reduction, and therefore the ALJ should not have used Table 2 of the grids, which applies when a claimant can perform less than a full range of light work, but Table 1 instead, which applies when a claimant is limited to sedentary work. Anders contends if the ALJ had done so, she would have determined Anders was disabled at all times since he turned 50, but the ALJ gave no reason for deviating from usual POMS practice. Anders adds that the exertional limitations the ALJ imposed (sitting for six hours and lifting no more than 8.5 pounds occasionally) are not in accord with

---

[2] The POMS is "a set of policies issued by the [Social Security] Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999). This court "defer[s] to the POMS provisions unless we determine they are 'arbitrary, capricious, or contrary to law.'" *Ramey v. Reinertson*, 268 F.3d 955, 964 n.2 (10th Cir. 2001) (quoting *McNamar*, 172 F.3d at 766).

the meaning of light work but instead resemble the exertional limitations of sedentary work.

We first disagree that the exertional component of the ALJ's RFC finding is equivalent to sedentary work. Certainly, the lifting limitation is in line with that of sedentary work, which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," 20 C.F.R. § 404.1567(a). And the ALJ did state Anders *could* sit for as much as six hours, which is consistent with sedentary work. *See* SSR 83-10, 1983 WL 31251, at *5 (1983) (explaining that in sedentary work, "sitting should generally total approximately 6 hours of an 8-hour workday"). But the ALJ also found Anders could stand and walk for 6 hours of an 8-hour workday provided that he could sit every 15 minutes, which is consistent with light work. *See id.* at *6 (explaining that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time"); *cf.* SSR 83-12, 1983 WL 31253, at *4 (1983) (stating that although most light work involves prolonged standing, an ALJ should consult a VE "[i]n cases of unusual limitation of ability to sit or stand"). Thus the ALJ's RFC was for light work, albeit not the full range of light work.[3]

_____

[3] Anders asserts that in a prior decision in his case the Appeals Council vacated, the same ALJ found he had an RFC for sedentary work despite greater lifting capacity and an uninterrupted capacity to stand and walk with the option of using a cane. But Anders has not suggested that the ALJ was bound by her prior findings, and in any event his assertion rests on a misreading of the prior decision.

(continued)

Because Anders's RFC was for a limited range of light work, it fell between grid rules for light and sedentary work directing opposite conclusions: Anders would be disabled under the applicable sedentary-work rule, 201.10, but not under the applicable light-work rule, 202.11. In that circumstance, the ALJ was required to determine the degree to which Anders's specific limitations eroded the occupational base for light work. *See id.* at *2. In easy cases, an ALJ might be able to make that call. *See id.* But "[w]here the extent of the erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource." *Id.*

As noted, the ALJ did consult a VE, which indicates the ALJ found the extent of the erosion unclear. The VE calculated the erosion based on her "experience and study of the jobs." Aplt. App., Vol. I at 71. Accounting for the erosion, there remained 20,000 jobs in the national economy, and Anders has not developed any argument that 20,000 is not a significant number of jobs.[4] Hence, the ALJ did not violate the general rule of POMS DI 25001.001.B.72 by not using Table 1 of the

---

The ALJ actually said Anders had "*at least* the [RFC] to perform the full range of sedentary *to light*, unskilled work," subject to a number of restrictions. Aplt. App., Vol. I at 130 (emphasis added).

[4] Anders does contend the VE's numbers were inaccurate. We address that contention in the next section. Anders does note, in his reply brief, that "[t]he ALJ never found that the jobs in a single or even two of the occupations represented a significant number of jobs." Aplt. Reply at 15. But this argument comes too late and is insufficiently developed to garner appellate review. *See Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief."); *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (arguments that insufficiently "frame and develop an issue" are insufficient "to invoke appellate review").

11

grids, but instead adhered to the guiding principles laid out in the agency rulings we have discussed. The ALJ was not required to provide any further explanation for not applying the POMS general rule.

**C.     The VE's testimony regarding the number of available jobs was reliable as a source of substantial evidence.**

Anders's final argument appears to have two parts. The first part, as best we can interpret, proceeds as follows: The VE said she got her numbers from the Bureau of Labor Statistics' (BLS's) Occupational Employment Statistics (OES). Aplt. App., Vol. I at 72. The OES states that as of May 2011,[5] there were 235,910 jobs nationally in a category of jobs termed "Production Workers, All Other," *id.*, Vol. VI at 19-6 000019, and that category includes the gluer job the VE identified.[6] But contrary to the VE's contention that there were approximately 50,000 such jobs, "gluer" is not listed among the five industries with the highest levels of employment, which range from 47,870 to 5,170 jobs. *Id.* Similarly, the OES states that as of May 2011, there were 434,170 jobs nationally in a category of jobs termed "Inspectors, Testers, Sorters, Samplers, and Weighers," *id.* at 19-6 00001, and that category

---

[5] The May 2011 statistics are relevant because Anders had to show he was disabled between his onset date in March 2011 and his date last insured, June 30, 2011. *See Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993).

[6] Anders incorrectly states that, according to the OES, there were 235,910 gluers jobs as of May 2011. We interpret his argument to mean that gluer falls within the category of "Production Workers, All Other."

includes the inspector/hand packager job the VE identified.[7]  But contrary to the VE's contention that there were approximately 50,000 such jobs, "inspector/hand packager" is not listed among the five industries with the highest levels of employment, which range from 25,500 to 15,730 jobs.  *Id.*  Hence, no reasonable person could accept the VE's testimony regarding the number of either jobs (before erosion to account for Anders's RFC) as reliable because it conflicts with the OES.

Anders's argument overlooks an important fact—the VE did not rely solely on the OES but also on information from the Occupational Employment Quarterly (OEQ), which, as the VE explained, used current population surveys (CPSs) rather than the OES.  When Anders's attorney asked the VE about the difference in the number of national production workers in the CPSs, which the attorney claimed was 800,000, versus the number of production workers in the OES, which the attorney claimed was 230,000, the VE said the OES was "more trustworthy" but that she used the OEQ and its reliance on the CPS numbers as "another resource to kind of balance things out."  Aplt. App., Vol. I at 75.  And the OEQ is a source that VE's rely on. *See Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014) ("For the numbers, vocational experts normally rely on a journal called the *Occupational Employment Quarterly*, published by a company called U.S. Publishing . . . .").  Accordingly, the fact that neither the gluer nor the inspector/hand packager job appears among the top

---

[7]  As with the gluer job, Anders incorrectly states that, according to the OES, there were 434,170 inspector/hand packager jobs.  We interpret his argument to mean that inspector/hand packager falls within the category of "Inspectors, Testers, Sorters, Sampler, and Weighers."

five industries with the highest level of employment does not render the VE's testimony unreliable. Further, it appears to us (as a matter of common sense) that gluer and inspector/hand packager are types of jobs that occur across industries, not industries in and of themselves, so it is unsurprising that neither would appear in a list of industries employing the most workers in these categories. Accordingly, Anders has not shown that the VE's job numbers so deviate from the OES as to be an unreliable basis for the ALJ's step-five finding.

The second part of Anders's final argument is that the VE stated another source of job numbers—a software program called Job Browser Pro—bases its numbers on the OES. Aplt. App., Vol. I at 75. And according to Job Browser Pro, when viewed by DOT job code, there are fewer than 2,000 of each job (before any erosion) in the national economy—1,613 gluer jobs, *id.*, Vol. II at 440, and 1,749 inspector/handpackager jobs, *id.* at 443. Anders claims the VE's testimony regarding the number of jobs is therefore irreconcilable with the number of jobs shown in Job Browser Pro. And because Job Browser Pro reflects the BLS's employment projections, which in turn form the foundation for the OOH, Job Browser Pro's numbers should, like the DOT and the OOH, be subject to administrative notice, and an ALJ should be required to obtain a reasonable explanation for any deviation from Job Browser Pro, just as an ALJ is required to do with deviations from the DOT. Here, the ALJ did not do so. Instead, the only support for the VE's testimony was her *ipse dixit*.

We reject this argument because Job Browser Pro is not among the examples listed in 20 C.F.R. § 404.1566(d) of data sources considered to provide reliable job information. Nor has Anders established that Job Browser Pro is sufficiently reliable to contradict the VE's testimony. The VE's statement that Job Browser Pro "basically get[s its] information from the OES," Aplt. App., Vol. I at 75, is insufficient to convince us that the numbers the VE gleaned from the OES are suspect to the point of failure as a source of substantial evidence.

### III. CONCLUSION

The district court's judgment is affirmed.

Entered for the Court

Terrence L. O'Brien
Circuit Judge

15