# United States Court of Appeals
## For the First Circuit

No. 16-2242

RITA PURDY,

Plaintiff, Appellant,

v.

NANCY A. BERRYHILL,

Acting Commissioner of the Social Security Administration,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. Jon D. Levy, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,*
and Selya, Circuit Judge.

Sarah H. Bohr, with whom Francis M. Jackson was on brief, for appellant.
Molly E. Carter, Special Assistant United States Attorney, with whom Richard W. Murphy, Acting United States Attorney, was on brief, for appellee.

April 3, 2018

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

SOUTER, **Associate Justice**. This is an appeal from the district court's affirmance of an administrative law judge's finding that the appellant, Rita Purdy, was not disabled and was thus not entitled to Supplemental Security Income (SSI) benefits. Although the record of her attempts to demonstrate disability is a complicated interplay of medical testimony, the facts to be considered in this appeal may be stated with relative economy, so far as they bear on the two issues raised before us: Whether the administrative law judge (ALJ) lapsed into error in according only slight weight to the testimony of a physician who treated Purdy for a non-displaced fracture of her left femur, and whether the ALJ was entitled to rely on evidence presented by the appellee Commissioner about available jobs that Purdy was qualified to perform. We affirm on both issues.

**I**

An applicant for SSI benefits[1] bears the burden of proof at the first four steps of a five-step procedure

---

[1] The Social Security Administration administers two separate benefits programs for the disabled: the Social Security Disability Insurance (SSDI) program under Title II of the Social Security Act and the SSI program under Title XVI of the Act. Whereas "[e]ligibility for SSDI depends on the insured person's contributions and insured status, SSI provides a minimum income for disabled people based on need." Dion v. Sec'y of Health & Human Servs., 823 F.2d 669, 670 (1st Cir. 1987) (citations omitted).

established to determine whether an applicant is entitled to disability benefits. <u>Freeman</u> v. <u>Barnhart</u>, 274 F.3d 606, 608 (1st Cir. 2001) ("The applicant has the burden of production and proof at the first four steps of the process."). An applicant for SSI benefits is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be "of such severity that [the applicant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." <u>Id</u>. § 1382c(3)(B).

The five-step sequence employed by the Social Security Administration (the SSA) proceeds as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such

that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (quoting 20 C.F.R. § 416.920 (2001)).

Put differently, even if an applicant fails to show disability at Step 3 because his impairment does not meet the conditions of a "listed" impairment in the Federal Regulations, he may still be eligible for benefits. In particular, if the applicant's "residual functional capacity"[2] is such that he cannot perform jobs he performed in the past, "the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform," or else a finding of disability is required. Freeman, 274 F.3d at 608.

## II

On October 10, 2011, Purdy filed an application for SSI benefits, alleging disability due to a total knee replacement in April 2011; thoracic and lumbar spine degenerative disc disease; right shoulder rotator cuff bone spurs; severe migraines, nerve damage, and throat problems; attention deficit hyperactivity disorder (ADHD) and attention

---

[2] An applicant's residual functional capacity "is the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. § 416.945(a)(1).

deficit disorder; post-traumatic stress disorder; panic disorder; substance abuse; and learning difficulties. Purdy's claim was initially denied on March 19, 2012, and again on reconsideration. In November 2012, Purdy filed a request for a hearing, which took place on February 11, 2014. On February 27, 2014, the administrative law judge who presided over Purdy's hearing issued a decision finding that Purdy was not disabled within the meaning of the Social Security Act and denying her claim.[3]

At Step 1, the ALJ found that Purdy had not engaged in substantial gainful activity since filing her application. At Step 2, the ALJ found that Purdy had the following severe impairments (i.e., impairments significantly limiting her ability to perform basic work activities, see 20 C.F.R. § 416.922): "status post knee replacement; degenerative disc disease; right shoulder rotator cuff bone spurs; chronic pain; dysthymia; anxiety disorder; ADHD; [and] history of substance abuse in remission." Addendum to Appellant's Amended Initial

_____

[3] The SSA employs a four-step administrative-review process. First, the SSA makes an initial determination of eligibility for benefits. If dissatisfied with that determination, the applicant may seek reconsideration. If dissatisfied with the reconsideration determination, the applicant may request a *de novo* hearing before an administrative law judge. Finally, the applicant may appeal the administrative law judge's determination to the Appeals Council, which has the discretion to deny review. See 20 C.F.R. §§ 416.1400, 416.1467. Once the applicant has exhausted his administrative remedies, he may seek review in federal court. 42 U.S.C. § 405(g).

Br. (Add.) 21. The ALJ noted that although Purdy had been diagnosed with a left hip stress fracture in April 2013,[4] the impairment was not "severe" as there was "no evidence in the record that it ha[d] persisted or [was] expected to persist for 12 consecutive months as required by 20 CFR §§ 404.1509 and 416.909." Id. at 21-22.[5] At Step 3, the ALJ found that Purdy did not have an impairment or combination of impairments that met the conditions for one of the "listed" impairments in the Social Security regulations. 20 C.F.R. § 416.920(d).

Having determined that Purdy's impairments did not meet the conditions for a listed impairment, the ALJ's next task was to determine Purdy's "residual functional capacity based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 416.920(e). The ALJ determined that Purdy retained the residual functional capacity to perform sedentary work in unskilled jobs with simple instructions and occasional interaction with others. The ALJ further determined that Purdy "should never climb ladders, ropes or scaffolds," "must not use foot controls," "must avoid exposure to hazards, such as unprotected heights," and could engage in "rare balancing,

---

[4] Presumably, a reference to the injury Purdy's treating physician called a fracture of the "left femur." See 8, infra.

[5] The ALJ determined that Purdy's alleged mental impairments resulted in only mild or moderate difficulties and did not entitle her to benefits at Step 3. Add. 22-23. Purdy does not challenge those determinations here.

crouching, crawling, kneeling, and climbing of ramps or stairs." Add. 23-24.

The ALJ explained that though Purdy claimed that she was unable to lift, bend, sit, stand, walk, or kneel without suffering extreme pain, Purdy's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible." Add. 25. In particular, Purdy's October 2011 "Function Report" indicated that she was able to cook meals, perform all household chores, go out alone, use public transportation, shop in stores, manage her finances, socialize with friends, and attend meetings. These activities, the ALJ reasoned, established Purdy's ability to perform sedentary tasks. The ALJ also observed, based on the notes from an emergency room visit in April 2012, that "[i]t seems [Purdy] exaggerates her symptoms and engages in opiate seeking behavior." Add. 26.

Significantly for purposes of this appeal, the ALJ accorded little weight to the opinion of Dr. Michael Kessler as provided on an SSA-issued form that Dr. Kessler completed regarding Purdy's ability to perform work-related activities. Dr. Kessler found that Purdy could lift or carry less than 10 pounds occasionally (and nothing frequently); could stand or walk for less than two hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; was limited in her

ability to push or pull with her lower extremities; could not climb, balance, kneel, crouch, crawl, or stoop; and could endure only limited exposure to vibration and humidity. Dr. Kessler attributed these limitations in Purdy's functioning to a "fracture of [the] left femur [with] delayed union."

In the ALJ's view, Dr. Kessler's opinion was conclusory and unsubstantiated: Dr. Kessler had "simply check marked boxes indicating [Purdy] had limitations that would increase the likelihood of [her] obtaining benefits[,] but did not explain why those limitations were chosen; in particular, he gave no examples of objective laboratory findings, symptoms or other medical evidence to support the conclusions." Add. 27.

By contrast, the ALJ accorded evidentiary weight to the findings of the State agency's non-examining medical and psychological consultants.[6] Those physicians had agreed, based on their analysis of the evidence in January and September 2012, respectively, that Purdy was capable of performing sedentary work within the limitations identified by the ALJ.

---

[6] Pursuant to SSA regulations, State agencies may (and often do) make the initial disability determination. 20 C.F.R. §§ 404.1610, 1611, 1613. A medical or psychological consultant "is a member of a team that makes disability determinations in a State agency, or . . . a member of a team that makes disability determinations for [the SSA]." Id. § 404.1616(a),(c) (citations omitted). The "consultant completes the medical portion of the case review and any applicable residual functional capacity assessment." Id.

The ALJ completed Step 4 by finding that Purdy had no past relevant work and went on to Step 5, where she determined that there were jobs existing in significant numbers in the national economy that Purdy could perform. That determination was based on the testimony of an impartial vocational expert (VE). The ALJ asked the VE to consider whether jobs were available in the national economy for someone with Purdy's age and education who could lift 10 pounds frequently and 20 pounds occasionally; could stand and walk for two hours in a workday; could sit for six hours in a workday; could rarely balance, crouch, crawl, kneel, or climb; could not work around hazards; could not climb ladders, ropes, or scaffolds; could not operate foot controls; and who could perform only simple jobs with simple instructions, limited changes, and only occasional interaction with the public.[7] The VE testified that such an individual could perform the sedentary, unskilled jobs of surveillance system monitor (of which she estimated there were

_____

[7] The ALJ's residual functional capacity determination, as reflected in the hypothetical she posed to the VE, differed from Dr. Kessler's in two key respects. First, whereas Dr. Kessler indicated that Purdy could not frequently lift or carry weight, the ALJ determined that she *could* carry up to 10 pounds with frequency. The ALJ's determination in that regard was consistent with that of the agency's non-examining physicians. Second, whereas Dr. Kessler indicated that Purdy could stand or walk for *less* than two hours in an eight-hour workday, the ALJ indicated that Purdy could stand or walk *for* two hours in an eight-hour workday. These differences were material to the VE, who testified that if Dr. Kessler's opinion were accepted and accurate, there would be no jobs available for Purdy to perform.

11,000 jobs in the national economy); document preparer (20,000 jobs in the national economy); and stem mounter (1,400 jobs in the national economy). On the basis of that testimony, the ALJ found that Purdy was not disabled within the meaning of the Social Security Act and denied her application.

The SSA's Appeals Council denied Purdy's request for review, rendering the ALJ's decision the Commissioner's final determination, which Purdy then appealed by bringing this action in federal district court. The magistrate judge recommended affirming the Commissioner's decision, and the district court, on *de novo* review, adopted the recommendation.

**III**

We review the district court's decision to affirm or reverse a final decision of the Commissioner *de novo* and the Commissioner's underlying decision for substantial evidence and conformity to relevant law. <u>Seavey</u>, 276 F.3d at 9 (citing 42 U.S.C. § 405(g)). Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not. <u>Bath Iron Works Corp</u>. v. <u>U.S. Dep't of Labor</u>, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted). Rather, "[w]e must uphold the [Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a

whole, could accept it as adequate to support [her] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam). "[I]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]," and "the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts." Id. (internal quotation marks omitted).

As mentioned before, Purdy's first claim of error is that the ALJ assigned inadequate weight to the opinion of her treating orthopedic physician, Dr. Kessler, as to her physical limitations. The ALJ's factual findings must be supported by substantial evidence and the legal standards must be correct. The relevant legal standard for a claim filed before March 27, 2017 (as Purdy's was) is the rule that a treating physician's opinion is controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). And even if not deemed controlling, a treating physician's opinion is entitled to weight that reflects the physician's opportunity for direct

and continual observation.  Id.[8]  There was, however, no error in the ALJ's determination to give "little" weight to Dr. Kessler's opinion.

To begin with, Dr. Kessler's opinion as reflected on the SSA-issued form made little sense on its face.  Dr. Kessler indicated both that Purdy had experienced the same physical limitations since 2011 and that the cause of her limitations was the 2013 femur injury.  Moreover, Dr. Kessler provided no discussion or analysis of his own prior observations, as the ALJ noted when she described his submission as merely checking the right boxes.  That itself goes a long way toward supporting the ALJ's determination to accord Dr. Kessler's opinion little weight.  Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The ALJ need not accept an opinion of a physician-even a treating physician-if it is conclusionary and brief and is unsupported by clinical findings.").

---

[8] The agency has eliminated the treating-physician rule for purposes of claims filed on or after March 27, 2017.  The agency no longer "defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [an applicant's] medical sources."  20 C.F.R. § 416.920c(a).  Instead, medical opinions and findings are evaluated for their persuasiveness according to a uniform set of considerations.  Id. § 416.920c(c).  These include the source's relationship with the claimant, but most important under the new regulations are supportability and consistency with the rest of the record.  Id. § 416.920c(b)(2).

But even more significant were Dr. Kessler's examination and treatment notes. Quite simply, Dr. Kessler's medical records of treating Purdy were at odds with his conclusions purporting to support Purdy's application. Purdy was diagnosed with a probable stress fracture in April 2013. Dr. Kessler's notes tracking the progress of the fracture made it clear that her prognosis was good. In July 2013, for example, Dr. Kessler noted that "there is a very, very strong chance that she will heal satisfactorily with no surgery." There was no displacement of the bone, and the required treatment was to avoid stress on the area so nature could take its course. The last mention of the femur in Dr. Kessler's records was on November 5, 2013, some three months before Purdy's hearing before the ALJ, and then Dr. Kessler noted that Purdy had a good range of motion in both hips and walked with minimal to no limp and without a cane (despite his recommendation). Though Purdy was continuing to experience pain, Dr. Kessler noted that "chances [were] she [would] end up getting away without having any surgery," and that even if the fracture did "fall apart," which Dr. Kessler labelled a "very small" risk, it could be fixed with surgery. Dr. Kessler's notes regarding Purdy's three further appointments before her hearing before the ALJ focused on a wrist injury and do not

- 13 -

mention the stress fracture, or any pain associated with it, at all.

No one could reasonably read these records as support for finding or predicating a twelve-month duration of any impairment from the fracture. The contrary is true. There was therefore no legal error in refusing to treat Dr. Kessler's opinion as controlling or in according it little weight for purposes of determining whether the fracture constituted a severe impairment.[9] For the same reasons, the ALJ did not err in according Dr. Kessler's opinion little weight for purposes of determining Purdy's residual functional capacity. Based on the record and the particular circumstances of this case, the ALJ was entitled to make a "common-sense judgment[]" that the healing stress fracture did not preclude Purdy from performing some sedentary work. Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990). An applicant's residual functional capacity is, after all, an administrative finding reserved to the Commissioner. 20 C.F.R. §§ 416.927(d)(2), 416.946.

---

[9] The appellant also takes the ALJ to task for suggesting that Dr. Kessler's unsupported opinion reflected personal sympathy for his patient. It is true, as the Commissioner concedes, that this was error, in the sense that the governing regulations do not list suspicions of sympathy as grounds for discounting a physician's opinion. But the error was insignificant in the context of this case: sympathy or no sympathy, the doctor's records just described do not support his findings as to Purdy's physical limitations.

- 14 -

As her second issue, Purdy says it was error for the ALJ to rely on the testimony of a VE to conclude that there were particular numbers of jobs that Purdy could perform, thus precluding (at Step 5) a conclusion that she was disabled. The nub of the objection is that the VE testified on the basis of numbers supplied by Job Browser Pro software available from a concern called SkillTRAN.

SkillTRAN's software has been recognized by at least one district court to be widely relied upon by vocational experts in estimating the number of relevant jobs in the national economy. See, e.g., Wood v. Berryhill, No. 17 Civ. 5430, 2017 WL 6419313, at *3 (W.D. Wash. Nov. 17, 2017) (describing Job Browser Pro as "the commonly accepted software used by . . . vocational experts"). The software takes as its starting point the Dictionary of Occupational Titles (the DOT), a Department of Labor publication that identifies thousands of jobs by name and describes the skills and capacity for physical exertion required to perform each.[10] The DOT "just *defines*

---

[10] The DOT, which has not been updated since 1991, has been criticized by some courts as "obsolete." Herrmann v. Colvin, 772 F.3d 1110, 1113 (7th Cir. 2014). Nevertheless, the Social Security Administration continues to treat the DOT as a "reliable" source of job data and takes administrative notice of its contents. 20 C.F.R. § 404.1566(d)(1). The Social Security Administration is "developing a new Occupational Information System . . ., which will replace the DOT as the primary source of occupational information SSA staff use in [their] disability adjudication process." Occupational Information System Project,

- 15 -

jobs," however; "[i]t does not report how many such jobs are available in the economy."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 446 (2d Cir. 2012) (per curiam).  And while the Government collects job data, it does so at an aggregated group level, rather than by DOT occupation, which renders estimating the number of jobs available in the economy for a given DOT occupation no easy task.  SkillTRAN's software attempts to address that shortcoming through its interpretation of the available data.

The objection to the evidence given by the VE rested on her testimony that she did not know what precise analysis SkillTRAN followed to produce the job-number estimates she gave for jobs that Purdy could perform.  On the basis of that testimony, and the third-party source for all figures used in the computations, Purdy argues that the VE's testimony should not be treated as expert evidence, but simply as parroting numbers immune to effective challenge by an applicant for benefits.

At the threshold, Purdy faces high hurdles. Admissibility of evidence before an ALJ presiding over Social Security proceedings is not subject to the Federal Rules of

SSA, https://www.ssa.gov/disabilityresearch/occupational_info_systems.html.  It plans to roll out the system in 2020 and to update it every five years.  Id.

- 16 -

Evidence, and an ALJ is given express authority to assess the reliability of evidence offered. See 42 U.S.C. § 405(b)(1) ("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure."); 20 C.F.R. § 404.950(c) ("[T]he administrative law judge may receive any evidence at the hearing that he or she believes is material to the issues . . . ."); see also Richardson v. Perales, 402 U.S. 389, 400 (1971) ("[S]trict rules of evidence, applicable in the courtroom, are not to operate at social security hearings so as to bar the admission of evidence otherwise pertinent[,] and . . . the conduct of the hearing rests generally in the examiner's discretion.").

To be sure, in spite of the breadth of judgment thus open to an ALJ, there have developed, not one, but two schools of thought for assessing the reliability of evidence in proceedings like this one. Drawing inspiration from Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702, the Seventh Circuit has charged ALJs with a version of the gate-keeping role that federal courts must play when considering whether to admit expert testimony. While recognizing that Rule 702 does not formally apply in Social Security proceedings, the Seventh Circuit has reasoned that "because an ALJ's findings must be supported by substantial

- 17 -

evidence, an ALJ may depend upon expert testimony only if the testimony is reliable." McKinnie v. Barnhart, 368 F.3d 907, 910 (7th Cir. 2004). And "[i]f the basis of the vocational expert's conclusions is questioned at the hearing . . . then the ALJ should make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable." Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002) (emphasis removed). Thus, in McKinnie, where the vocational expert's proffered basis for her job-estimate figures was vague and unsubstantiated by documentation, the Seventh Circuit held that the ALJ erred by not enquiring into the reliability of the vocational expert's opinion. 368 F.3d at 911.

The Seventh Circuit stands alone, however, in imposing a Daubert-like requirement on ALJs in Social Security cases. The Ninth Circuit has disclaimed any such standard for testing the reliability of a VE's testimony regarding the number of relevant jobs in the national economy. Rather, that court has explained that "[a] VE's recognized expertise provides the necessary foundation for his or her testimony." Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005). And the Second Circuit, too, has cast significant doubt on the Seventh Circuit's approach. In particular, in Brault, the Second Circuit responded to a challenge similar to the one lodged here

with the observation that the Seventh Circuit's approach was inconsistent with Congress's clear determination that the Federal Rules of Evidence not apply in Social Security proceedings, see 42 U.S.C. § 405(b)(1), Richardson, 402 U.S. at 400-01, and deemed it puzzling that the "the Seventh Circuit would acknowledge . . . that ALJs are not bound by the Rules of Evidence, but then turn around and require ALJs to hew so closely to Daubert's principles," Brault, 683 F.3d at 449. For that matter, the Second Circuit was not persuaded that a Daubert-like hearing would be useful given the pertinent standard of review. The "substantial evidence" standard, the court noted, is "extremely flexible," "giv[ing] federal courts the freedom to take a case-specific, comprehensive view of the administrative proceedings, weighing all the evidence to determine whether it was 'substantial.'" Brault, 683 F.3d at 449. The Second Circuit "thus affirmed, not on any Daubert basis, but instead on typical 'substantial evidence' grounds." Id. at 450.[11]

We fail to see an adequate answer to the Second Circuit's argument. This is not to say that we could go to the

---

[11] Ultimately, the Second Circuit in Brault declined to resolve the extent to which an ALJ must ever test a VE's testimony, simply noting its agreement with the Seventh Circuit to the extent that "evidence cannot be substantial if it is 'conjured out of whole cloth.'" 683 F.3d at 450 (quoting Donahue, 279 F.3d at 446).

extreme of approving reliance on evidence of the software numbers offered by a witness who could say nothing more about them than the name of the software that produced them.[12] But that is not the case here. The VE, whose qualifications Purdy did not challenge, testified that the job numbers were from the Bureau of Labor Statistics and were stated in reference to job descriptions in the DOT; that is, they were specific to jobs, not to broad amalgams of jobs, some of which an applicant might be able to perform but not others. The VE testified that the software's conclusions on the described basis were generally accepted by those who are asked to give the sort of opinions sought here. She testified, in other words, to a reliable and practical basis of fact on which analysis was performed, and to a wide reputation for reliability. Given the broad discretion on the part of an ALJ, and the complete lack of any competing evidence or critique, it is hard to see an abuse of discretion in the judge's refusal to demand, say, that a VE perform her own data-gathering field work, or be a statistician capable of duplicating the software analysis of the basic material. See Pena v. Comm'r of Soc. Sec., 489 Fed. App'x 401, 403 (11th Cir. 2012) (rejecting similar challenge because "ALJ was entitled to

_____

[12] Nor do we foreclose the possibility that an applicant could demonstrate the methodology employed by Job Browser Pro (or any other software) to be so unreliable that it cannot constitute substantial evidence. No such attempt was made here.

- 20 -

rely upon the VE's testimony without requiring the VE to provide a comprehensive statistical explanation of how he arrived at . . . job number figures."). Nor does Purdy seriously confront the question of what more might be required. Rather, she simply couches her objection in the general terms that more personal "knowledge, experience or expertise" ought to be required of a VE relying on Job Browser Pro. At this level of generality, the argument is too ethereal to carry the day in demonstrating legal error in the ALJ's judgment to rely on the testimony here.[13]

**IV**

The ALJ's determination that Purdy was not disabled within the meaning of the Social Security Act was supported by substantial evidence. We affirm.

---

[13] Purdy also contends that the ALJ mischaracterized the statements of a physician who examined her in 2012 and improperly credited the opinions of the State agency non-examining physicians. Purdy did not adequately present these arguments in her objections to the magistrate judge's recommended decision. They are therefore waived. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988).