**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 4, 2020
Decided August 19, 2020

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 20-1042

| | |
|---|---|
| PAUL M. RENNAKER, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Northern District of |
| | Indiana, Fort Wayne Division. |
|     *v.* | |
| | No. 1:18cv428 |
| ANDREW M. SAUL, | |
| Commissioner of Social Security, | Robert L. Miller, |
|     *Defendant-Appellee*. | *Judge*. |

## O R D E R

An administrative law judge denied Paul Rennaker's application for Social Security disability benefits after finding that Rennaker could perform jobs that exist in significant numbers in the national economy. The district court upheld the ALJ's determination. But because the vocational expert did not provide a basis for the reliability of the national numbers he posited, substantial evidence does not support the ALJ's decision. We therefore vacate the judgment and remand for further proceedings.

**I**

Rennaker, now 52 years old, applied for Title II disability insurance benefits and supplemental security income in June 2015. He alleged impairments including diabetes, neuropathy in his feet, depression, and injuries to both legs and his lower back. Rennaker worked as a sheriff's deputy from 1990 until October 21, 2014, when he injured his back and legs during defensive tactics training, at which point he says he became disabled and went on administrative leave.

Back in October 2014, six days after his training injury, Rennaker was diagnosed with contusions (strains) in both thighs by a nurse practitioner. In five visits between late October and early December, medical professionals told Rennaker he could return to work with "modified/restricted duties"—specifically, he should limit time spent lifting anything greater than 25 pounds, squatting, or kneeling. They also told him to alternate between sitting and standing, apply cold packs to his legs, and begin physical therapy.

By mid-December, Gregory Kniss, D.O., deemed Rennaker's injury "functionally resolved" when Rennaker sought treatment for pain caused by leg cramps. Dr. Kniss prescribed acetaminophen and told him to continue his home exercises but noted that he could return to work with "regular duties."

Four months later, Rennaker began seeing David Reinhard, M.D.; he diagnosed Rennaker with diabetes, depression, and diabetic neuropathy. But Rennaker's mood, judgment, and thoughts were all "normal." During this series of appointments with Dr. Reinhard, Rennaker applied for disability benefits and supplemental security income.

In connection with these applications, Rennaker was examined by a physician and a psychologist in July 2015. H.M. Bacchus, M.D., noted that Rennaker had pain in his left hip, lower back, and both knees, as well as diabetes, which was "currently diet and exercise controlled." Dr. Bacchus reported that Rennaker had limitations with, among other things, "prolonged sitting, standing and walking." Psychologist Amanda Mayle, Psy.D., diagnosed Rennaker with major depression. But his insight and judgment were "adequate," his speech was "normal," and his thoughts were "logical and coherent."

A state-agency consulting physician, B. Whitley, M.D., reviewed Dr. Bacchus's report along with other medical evidence and opined that Rennaker had the capacity for "light" work. Dr. Whitley noted that with normal breaks, Rennaker could stand or

walk "about 6 hours in an 8-hour workday"; with normal breaks, he could also sit for the same amount of time. X-rays of his left hip, left knee, and lumbar spine revealed "minimal" scoliosis and arthritis in his spine and "minimal degenerative changes" in his hip. Rennaker did not have any manipulative, visual, or communicative limitations. Dr. Whitley also noted that Rennaker stood 6'4" and weighed 300 pounds. Psychologist J. Gange, Ph.D., reviewed Dr. Mayle's report along with the rest of the record evidence and opined that Rennaker's depression was "not severe." He had only "mild" limitations on his social functioning and concentration, persistence, or pace.

Rennaker's initial applications for disability benefits and supplemental security income were unsuccessful; he filed for reconsideration in October 2015. Rennaker also submitted a function report about his daily activities. He wrote that the only person he took care of was his grandfather, whom he visited and sat with, and that his wife "helps with our children and pets." Although he could prepare simple meals (sandwiches), fold clothes, and do light repairs, he had difficulty dressing himself. His wife had to remind him to take his medication. He also had difficulty with a range of actions, such as lifting, standing, walking, sitting, kneeling, and climbing stairs, and with mental tasks such as remembering, completing tasks, concentrating, and following instructions.

Finally, in January 2016, Rennaker saw examining consultant Carolyn Greer, M.D., who noted that Rennaker could walk for 15 minutes, stand for 15 to 20 minutes, climb one to two flights of stairs, and lift 50 pounds with his left arm and his right arm. Dr. Greer also noted that Rennaker had normal posture, was able to get on and off the table without assistance, had normal straight leg-raising, and had normal strength in his right and left extremities. Dr. Greer's report was reviewed by state-agency physician Fernando Montoya, M.D., who opined that Rennaker could perform "light" work. Dr. Montoya largely incorporated Dr. Whitley's opinion but added that Rennaker should "avoid unprotected heights and slippery, uneven walking surfaces due to neuropathy."

After the agency denied Rennaker's applications again upon reconsideration in January 2016, he requested a hearing before an ALJ, which took place on July 31, 2017. (Seven months before his hearing, he began working full-time; he provides security at a local hospital, where he is on his feet 30 percent of the time.) At the hearing, Rennaker was unrepresented by counsel. When the ALJ asked Rennaker if he wished to proceed without a lawyer, he said "yes" and signed a waiver of his right to representation. Rennaker testified that he left his job as a sheriff's deputy because of his "physical limitations," chief among them pain in his legs and feet. He took pain medication and received treatment for his depression.

The ALJ then examined a vocational expert, who began by explaining his qualifications, which included 25 years of experience and a master's degree in vocational rehabilitation counseling; in this role, he placed people into jobs. Rennaker did not object to the VE's qualifications. The ALJ then asked the VE if he planned to use "national numbers," which the VE confirmed.

The ALJ asked the VE about the work available to a person of Rennaker's age, experience, and physical limitations. At first, the ALJ posed a hypothetical that allowed for standing or walking for four hours in an eight-hour workday with the option to alternate positions every hour. The ALJ then paused to ask Rennaker to clarify his limitations between December 2014 and December 2016. Rennaker testified that during that period, he could sit for "maybe 15 or 20" minutes at a time; he could not have stood in one spot "nearly as long as I do now." The ALJ then modified the hypothetical to limit standing or walking to two hours in an eight-hour workday, with the option to alternate positions every 30 minutes. The VE testified that although security guard work would be ruled out, sedentary jobs would still be available in the national economy: 44,000 jobs as a food order clerk, 34,000 jobs as a charge account clerk, and 29,000 jobs as a polishing machine operator, for example.

The ALJ only asked one question about the jobs that the VE cited: "[A]re they consistent with the description in the DOT [Dictionary of Occupational Titles]?" The VE responded, "For the most part." He explained that some of the limitations identified by the ALJ—such as Rennaker's need to change positions, take absences, and have time off-task—were not addressed by his sources. As a result, the VE based his opinion of the work Rennaker could perform on his education, research, training, and experience in job placement and vocational rehabilitation. Rennaker asked the VE no questions.

Applying the Administration's five-step analysis, 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), the ALJ determined that during the applicable time period, Rennaker was not disabled and could perform light work. The ALJ noted that because Rennaker had been employed in substantial gainful activity since December 12, 2016, the decision's analysis applied to the period from October 21, 2014 through December 11, 2016.[1]

Citing the objective medical evidence, medical opinions, and Rennaker's symptoms and daily activities, the ALJ found that Rennaker had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), with

---

[1] Rennaker does not contest that this work was substantial gainful activity and that his alleged period of disability covers October 21, 2014 through December 11, 2016.

limitations on standing, walking, and sitting, and the option to change positions every 30 minutes. The ALJ gave great weight to the opinion of state-agency psychologist Dr. Gange, which was supported by Rennaker's largely "unremarkable" mental status evaluations. The ALJ also gave great weight to the opinions of state-agency physicians Dr. Whitley and Dr. Montoya, which were supported by Rennaker's normal strength in his arms and legs, normal deep tendon reflexes, and normal straight-leg raises. As for his daily living activities, the ALJ found that these suggested Rennaker was not as limited as alleged. The ALJ emphasized that Rennaker was capable of "preparing meals, performing housework, folding clothes, light repairs, reading, studying, exercising, caring for children and pets, driving, and shopping." In particular, the ALJ deemed childrearing quite demanding both physically and emotionally, suggesting "a level of functioning and concentration inconsistent with the degree of back pain alleged."

Given Rennaker's RFC, the ALJ found that he could not perform any past relevant work but could do other jobs existing in significant numbers nationally, such as a food order clerk, charge account clerk, or polishing machine operator.

The Appeals Council denied review, and the district court upheld the ALJ's denial of benefits.

## II

We vacate an ALJ's decision on benefits only when it is not supported by "substantial evidence," 42 U.S.C. § 405(g), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). That said, we do not "scour the record" for reasons to uphold the decision. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014).

### A

Rennaker first argues that the ALJ did not develop a full and fair record because his examination of the VE was deficient—specifically, the ALJ did not inquire into the reliability of the nationwide job numbers posited, where the numbers came from, or the methodology used to determine them.

We agree with Rennaker. At the final step of its five-step analysis, the agency bore the burden of demonstrating the existence of significant numbers of jobs in the national economy that Rennaker could perform. *See* 20 C.F.R. § 416.960(c)(1); *Chavez v.*

*Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018). A finding based on unreliable VE testimony is not based on substantial evidence and must be vacated. *Chavez*, 895 F.3d at 968. "The substantial evidence standard requires the ALJ to ensure that the approximation [of job numbers] is the product of a reliable method." *Id.* Further, an ALJ has a duty to develop a full and fair record; this duty is enhanced when when a disability benefits claimant is unrepresented, as Rennaker was. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). When faced with a pro se claimant, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Id.* (citations and internal quotation marks omitted). Thus, both the substantial evidence standard and Rennaker's pro se status demanded more from the ALJ.

First, the VE's testimony, on its own, did not constitute substantial evidence. He did not provide any reason for why he had a "reasonable degree of confidence in his estimates." *Chavez*, 895 F.3d at 969. When asked if he planned to use national numbers in his testimony, the VE said simply, "Yes." Although the VE pointed to his own education, research, training, and experience in job placement and vocational rehabilitation to explain the *kind* of work Rennaker could perform, the VE did not explicitly tie this background to his estimate of nationwide job numbers. In other words, although a VE may draw from his expertise to provide a reasoned basis for his job-number estimates, *see id.* at 969, the VE in this case did not bring any aspect of his experience to bear on the reliability of those numbers. He did not say *why* he thought his numbers were reliable.

Second, given the VE's sparse testimony, the ALJ did not do enough to develop the VE's testimony such that it would constitute substantial evidence. The ALJ asked only one question about the jobs cited by the VE—whether these jobs were consistent with the job descriptions listed in the DOT. The manual does not provide job-number estimates, only job duties and requirements, so consistency with the manual would not provide a basis for the job-number estimates' reliability. For that matter, this manual was last revised in 1991. *See* SOC. SEC. ADMIN., Occupational Information System Project, https://www.ssa.gov/disabilityresearch/occupational_info_systems.html (last visited August 12, 2020)).

Thus, the ALJ had no reasoned basis to accept the VE's job-number estimates.

B

Rennaker also argues that in assessing the intensity of his symptoms, the ALJ "overemphasized" his daily activities to the exclusion (or minimizing) of other

evidence. Rennaker contends that the ALJ should not have drawn inferences from his daily activities without asking about what they entailed; for example, the ALJ should have asked about "the parameters of the caregiving and about whether said caregiving activity increased his pain." This, Rennaker says, would have revealed that he could not engage in competitive work. We disagree. As the Commissioner argues, the ALJ did not "overemphasize" Rennaker's daily activities because the ALJ relied on other evidence, such as the objective medical evidence and medical opinions—which constituted substantial evidence supporting the ALJ's credibility finding.

As an initial matter, the ALJ possibly misrepresented Rennaker's daily activities with respect to caregiving. In his function report, Rennaker wrote that the only person he took care of was his grandfather, whom he visited and sat with, and that his wife "helps with our children and pets." Even if this means that Rennaker spent some time on childcare—though it is unclear whom his wife "helped"—the ALJ's reliance on these duties lacks support. Rennaker did not testify about childcare, and nothing in the ambiguous statement about his wife explains the ALJ's belief that Rennaker engaged in caretaking that was "taxing both emotionally and physically."

But the ALJ's mistake was harmless because the ALJ did not rely on Rennaker's daily activities to the exclusion of other evidence; nor did he equate these activities with competitive work. He noted only that these activities suggested that Rennaker was not as limited as he alleged. As detailed earlier, the ALJ relied on the entirety of the record to discount Rennaker's account of the severity of his symptoms. For example, the ALJ relied on "rather good" diagnostic imagining and Dr. Greer's physical exams that showed normal strength in his arms and legs and normal deep tendon reflexes. The ALJ also relied on mental-health notes by Dr. Reinhard and Dr. Mayle that recorded Rennaker's normal thought process and judgment.

Rennaker argues that the ALJ further erred in assessing the intensity of his symptoms by failing to consider his good work record, through which he had earned substantial credibility. Again, we disagree. As the Commissioner argues, Rennaker's good work record did not contradict the ALJ's findings or detract from the substantial evidence supporting the ALJ's assessment of Rennaker's allegations of disability.

As Rennaker himself notes, work history is just one factor among many and is not dispositive. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). An ALJ need not evaluate in writing every piece of evidence, so the failure to explicitly and favorably discuss Rennaker's work history when evaluating his credibility is not, by itself, reversible error. *See Summers v. Berryhill*, 864 F.3d 523, 528–29 (7th Cir. 2017). In this

case, substantial evidence supports the ALJ's assessment of Rennaker's allegations of disabling pain. When considering the intensity of a claimant's symptoms, the agency examines "the entire case record," which includes the objective medical evidence, the claimant's statements, and statements by other medical sources and persons. Social Security Ruling 16-3p Titles II and XVI: Evaluation of Symptoms in Disability Claims, 82 Fed. Reg. 49462, 49464 (October 25, 2017). Here, the ALJ did just that, relying on the physical exams indicating normal posture and strength, as well as the opinion evidence indicating the ability to sit and stand (with mild limitations), to conclude that the intensity of Rennaker's symptoms did not match his statements.

C

Finally, Rennaker argues that the ALJ failed to address his obesity, so remand is required for the ALJ to consider its effects on his impairments. The Commissioner, on the other hand, argues that the ALJ implicitly considered Rennaker's obesity because he cited doctors whose records note Rennaker's height and weight. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). Further, the Commissioner contends, Rennaker failed to identify any limitations caused by his obesity.

The record does not provide confidence that the ALJ considered Rennaker's obesity. In *Prochaska*, this court determined that the ALJ considered obesity because he relied on medical reports in which doctors referred to the claimant as "overweight" and "chronically obese." 453 F.3d at 737. And other reports listed the claimant's height and weight, so this court concluded that "the record relied upon by the ALJ sufficiently analyzes her obesity." *Id.* Here, the reports simply record Rennaker's height and weight, which is harder to characterize as "analysis." No report that the ALJ relied upon discussed whether obesity contributed to or exacerbated Rennaker's other impairments. *See Pepper v. Colvin*, 712 F.3d 531, 364–65 (7th Cir. 2013).

But the ALJ's oversight was harmless. "An ALJ's failure to explicitly consider an applicant's obesity is harmless if the applicant did not explain how her obesity hampers her ability to work." *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (citations and internal quotation marks omitted). And Rennaker points to nothing in the record to support his argument that "it would be expected" that his obesity would aggravate his diabetes and hypertension and diminish his ability to sit, stand, lift, and walk. He did not seek treatment for obesity or report any limiting effects of obesity; further, he did not testify that obesity affects him in any way. Thus, any consideration of obesity by the ALJ would have been speculative.

**III**

For these reasons, we VACATE the judgment and REMAND the case for the ALJ to ensure that there is a reasonable basis to accept the VE's job-number estimates.