NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 6, 2020
Decided November 5, 2020

**Before**

DIANE P. WOOD, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-3529

| | |
|---|---|
| HOSEA MATTHEWS,<br>    *Plaintiff-Appellant,* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 18 C 2926 |
| ANDREW M. SAUL,<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | Jeffrey I. Cummings,<br>*Magistrate Judge.* |

**O R D E R**

Hosea Matthews, a 25-year-old man suffering from narcolepsy, challenges the denial of his applications for Social Security benefits. He argues that the administrative law judge failed to account for all the functional limitations supported by the record—that he took at least one nap per day, and that he had limits in concentration, persistence, and pace—and improperly discounted his subjective accounts of the severity and limiting effects of his narcolepsy. So, Matthews asserts, the residual functional capacity determined by the ALJ was insufficiently restrictive. While one could read the record to lead to such a result, that is not our task on appeal. Substantial evidence—including the opinions of the agency doctors and the testifying expert—supports the ALJ's conclusion, so we affirm.

## Background

In October 2014, Matthews, then 19 years old, applied for child's disability insurance benefits and supplemental security income, asserting he had been unable to work since July 2014 because he kept falling asleep. The Social Security Administration denied his claims at all levels of review. Because Matthews challenges only the ALJ's assessment of his narcolepsy, we focus on that aspect of his medical history.

Five months before applying for benefits, Matthews saw Linda Hushaw, a nurse practitioner, complaining of too much sleep after a car accident the day before when he had fallen asleep while driving. Her notes reflect that Matthews reported he exercised and had active hobbies. Hushaw advised Matthews to "avoid driving or operating dangerous machinery or engag[ing] in any other high risk activity," and she referred him to a neurologist.

A month later, Matthews saw Dr. Ahmad Agha for a sleep consultation. At his first appointment, Matthews complained of excessive daytime sleepiness and decreased energy for many years. He said he usually slept between 10:00 p.m. and 4:00 a.m. and that he took a daily nap. Dr. Agha referred him for a sleep study, which indicated narcolepsy. Dr. Agha then confirmed the diagnosis, prescribed Provigil, and told Matthews to avoid driving.

Days later, Matthews saw nurse practitioner Hushaw again and reported that due to a lack of insurance coverage he was unable to get the Provigil Dr. Agha had prescribed. Hushaw's notes reflect that Matthews denied fatigue and that he exercised and had active hobbies. (Matthews saw Hushaw four more times over the next two years for unrelated issues like asthma and allergies, and her notes reflect that Matthews generally denied fatigue, exercised, and had active hobbies.)

Over the next two years, Matthews had five more appointments with Dr. Agha, who prescribed different medications to alleviate Matthews's complaints of excessive daytime sleepiness. Dr. Agha prescribed Ritalin, but Matthews said he was still sleepy on the medicine. He would wake at 8:00 a.m., take the medicine, then nap for 30 minutes, and at 5:00 p.m. he would go back to sleep. So Dr. Agha prescribed him Provigil (again), as well. A few months later, Matthews explained he could not obtain Provigil and that Ritalin was not helping much as after a few hours of taking it, he again became very sleepy. Dr. Agha noted that because of his insurance Matthews was very limited with medication choices. But he prescribed Nuvigil, noting that it should be approved by his insurance company and instructed Matthews to "[t]ake caution

driving, avoid alcohol, nicotine, stick to [a] routine, [and] exercise." Matthews later described his routine while taking Nuvigil: he would go to bed at 10:00 p.m., wake at 7:00 a.m., take the medicine, and sleep in the car (presumably at the landscaping job he held around this time) before arriving home at 5:00 p.m. Dr. Agha suggested that he "try no nap."

Two doctors acting as agency consultants reviewed Matthews's record in connection with his applications for benefits. In January 2015, after reviewing Dr. Agha's notes, Dr. Richard Bilinsky concluded that Matthews's statements regarding his symptoms from narcolepsy were only partially credible because they were not fully supported by the objective evidence. But because of Matthews's narcolepsy, Dr. Bilinsky limited Matthews to never using ladders, ropes, and scaffolding; only occasionally using stairs; and avoiding even moderate exposure to hazards like machinery and heights.

Later, at the reconsideration stage, Leah Holly, D.O., largely agreed with Dr. Bilinsky's conclusions. At this time, Matthews reported that although there had been no changes in his condition since his initial applications, he could (and did) fall asleep at any given time, including while bathing, eating, and using the toilet. His daily activities—which included performing household chores, walking, driving a car, and riding a bike—had not changed. Dr. Holly concluded that although Matthews reported that narcolepsy caused significant interference with his activities during the day, the evidence did "not reveal specific limitations, quantify, or describe such [interference]." She agreed with the limits Dr. Bilinsky put on Matthews and added that he should avoid "driving, [] unprotected heights, open bodies of water[,] and hazardous moving machinery."

At a December 2016 hearing before the ALJ, Matthews testified about two jobs he held briefly that year. He first worked full-time for two to three months at a landscaping company owned by his mother's best friend before he was fired for falling asleep while putting equipment away. He said he often slept while his team was driving around. Then Matthews worked part-time at a tire shop, where he also slept often, until the shop closed after a few weeks. On his narcolepsy more generally, Matthews testified that during his senior year of high school his problems with sleeping "really got bad." The ALJ asked Matthews how often he would sleep during the day, and Matthews said that even though he slept through the night, he would fall asleep "a lot … like six times" per day. Matthews said his medications were not helping as he was "starting to get immune" to them, but his doctors told him there was little more they

could do other than offering him different medicines, some of which his insurance did not cover.

Dr. Sai Nimmagadda, a specialist in pulmonary medicine and pediatrics, also testified as a medical expert. Based on the record, he identified multiple functional limitations, including Matthews only occasionally using stairs; never climbing scaffolding; and avoiding dangerous machinery, unprotected heights, and commercial driving. Dr. Nimmagadda testified that these limitations, which were "variable through the record in sustainability," were all the limitations he would define from the record. In the record he did not see the frequency of the narcoleptic episodes that Matthews described. And, Dr. Nimmagadda stated, "[t]he claimants who have this narcolepsy" often have daytime somnolence, adding that these episodes would have a variable although some effect on his concentration, persistence, and pace.

In posing hypothetical questions to a vocational expert ("VE"), the ALJ first described a person with physical restrictions (such as avoiding workplace hazards and operating a motor vehicle but occasionally using stairs) and limits to "simple, routine tasks and to making simple work-related decisions." The VE responded that the person could work as a housekeeping cleaner, laundry laborer, or transportation cleaner—jobs that allow for three regular breaks and other bathroom breaks. But one break per hour would not be tolerated, the VE said, and the person could be off task only ten percent of the time. When Matthews's counsel posited the person needing two more 20-minute breaks at random times throughout the day, the VE responded that such breaks would not be acceptable.

Applying the standard five-step process, *see* 20 C.F.R. §§ 404.1520, 416.920, the ALJ concluded that Matthews's recurrent hypersomnia and narcolepsy were severe impairments, but neither—alone or in combination—met or equaled a listing consistent with a presumptive disability. The ALJ determined that Matthews had the residual functional capacity to perform a full range of work with certain non-exertional limitations, including avoiding workplace hazards and driving, and could perform "simple, routine tasks and make simple work related decisions." The ALJ concluded that with those limitations, and consistent with the VE's opinion, Matthews could work in jobs available in the national economy and therefore was not disabled.

The ALJ found that Matthews's statements regarding the severity of his limitations—including that he would sleep six times per day, would fall asleep only an hour after waking, and got little benefit from his medication—were less than fully consistent with the record. The multiple medical opinions in this case were generally

consistent with one another, restricting Matthews only from workplace hazards or driving.[1]  Matthews had also reported that his medication had helped him, and he failed to seek additional care from Dr. Agha for almost a year after, as Matthews testified, his condition had worsened. And the medical record, including his treatment providers' notes, did not support any additional restrictions in his RFC.

The ALJ also explained that Matthews's daily activities did not reflect symptoms as severe as he alleged. Matthews testified he did chores in the morning, and he had reported in May 2015 that he drove a car and rode a bike. While he said that he fell asleep while completing activities, there were no records of treatment for injuries from falls or accidents. The ALJ also noted that, given his three-month full-time employment as a landscaper, "[o]ne would assume" that if Matthews had been falling asleep six times per day, he would have been fired "well before" he was.

The Appeals Council denied review. The district court upheld the ALJ's decision, finding it supported by substantial evidence, including by every medical opinion in the record.

## Analysis

This court reviews the district court's decision de novo in determining whether the ALJ's decision was based on substantial evidence. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

On appeal, Matthews argues the ALJ overstated his residual functional capacity (RFC) by failing to account for his limitations in concentration, persistence, and pace, and his need to nap at least once per day. In Matthews's view, the medical expert's testimony and other professionals' opinions require these limitations.

We have closely examined Matthews's arguments and the evidence, but we find no opinion in this record which explicitly identified the functional limitations he believes should have been included. Rather, the assigned RFC is consistent with, and

---

[1]  The ALJ gave "great weight" to the opinions of Matthews's treatment providers and the testifying expert. But among the agency consultants, she placed greater weight on Dr. Holly's opinion than Dr. Bilinsky's, because the latter omitted limits on certain workplace hazards and driving.

encompasses the scope of, the limitations set forth in the state agency consultants' and testifying medical expert's opinions. These opinions were also consistent with those of Matthews's treatment providers. So we see no error in the ALJ relying upon their opinions. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (no error where record lacked doctor's opinion containing greater limits than those found by ALJ).

Matthews asserts the ALJ ignored the medical expert's testimony that he would have impaired concentration, persistence, and pace during the day. But the ALJ credited every limitation that the medical expert identified, including those concerning workplace hazards and driving. Indeed, the expert stated those were "all of the limitations he would define from the record." True, under examination by Matthews's attorney the expert testified that narcolepsy would have some effects on concentration, persistence, and pace owing to daytime somnolence.[2] But the expert did not testify that these effects required another functional limitation. Matthews's counsel had the opportunity, which was not taken, to question the expert further as to whether the narcolepsy merited any additional limitations. Because Matthews was represented by counsel at the hearing, he is "presumed to have made h[is] best case before the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). True, the ALJ could have asked the expert herself, but it is Matthews's burden, not the ALJ's, to prove that he is disabled. *Id.* Further, Matthews does not take issue with the ALJ's finding that his impairment in concentration, persistence, and pace was only "mild"—the lowest designation on the five-point scale, other than "none." 20 C.F.R. § 404.1520a(c)(4).

Relatedly, Matthews argues the ALJ's failure to account for his daytime sleepiness and napping is inconsistent with the medical opinions. He asserts that any doctor who limited his exposure to workplace hazards and prohibited driving must have credited that he will be excessively drowsy or fall asleep uncontrollably. He contends these same symptoms would necessarily cause him to nap and be "off-task and 'unreliable' at random times" throughout the day as well, so the absence of such limitations in the RFC is inherently illogical.

But Matthews's assertion does not necessarily follow, as the options were not so sharply defined. And the medical opinions do not have the breadth Matthews attributes

---

[2] The Commissioner argues that the expert was testifying only generally on this point. The testimony is not entirely clear; the expert began by discussing "[t]he claimants" with narcolepsy. But his later answers, including those most relevant here, used the word "he," presumably referring to Matthews.

to them. The ALJ could have reasonably (as discussed below) credited the existence of his symptoms while discounting their purported severity and frequency. Even if the evidence could support additional limitations, such as time off-task or added breaks, the record evidence did not require the ALJ to draw this conclusion. "[T]he resolution of competing arguments based on the record is for the ALJ, not the court." *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). This is another area where Matthews, knowing the scope of the opinions before the hearing, could have better developed this proof before the ALJ.

Because such limitations on Matthews's functional capacity were not present in any of the medical opinions, the only way the ALJ could determine whether those limitations were necessary was by assessing Matthews's credibility. Matthews argues the ALJ erred regardless of this assessment. But, as explained above, the medical record alone does not require the limitations he seeks. Even Matthews's best example of additional limits in his providers' notes—that Dr. Agha told him to try "no nap" during the day—is subject to a credibility assessment because the doctor relied on Matthews's subjective descriptions in arriving at this directive. *See Mitze v. Colvin*, 782 F.3d 879, 881-82 (7th Cir. 2015). And Matthews had the chance to bring forth more direct evidence in support of his position, but he failed to do so.

In any event, Matthews argues the ALJ improperly discounted his allegations regarding the severity and limiting effects of his narcolepsy. To evaluate Matthews's subjective symptoms, the ALJ needed to consider the objective medical evidence and other evidence, including medical opinions, his treatment providers' notes, his daily activities, and his work history. *See* 20 C.F.R. § 404.1529(c). Matthews first asserts that the ALJ failed to explain how his daily activities—including performing his chores, driving a car, and riding a bike—are inconsistent with his self-reported symptoms. Matthews adds that the ALJ made only assumptions about his attempts to work and ignored his treatment providers' notes that he experienced daytime fatigue despite his medication.[3]

---

[3] The Commissioner concedes the ALJ erred by drawing a negative inference from Matthews's failure to pursue follow-up treatment without asking for an explanation, *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), but argues that the error is harmless. We agree because the other evidence the ALJ cited adequately supports her conclusion.

The record demonstrates that the ALJ considered the relevant regulatory factors. It is true that on certain points her reasoning was not airtight. As examples, the ALJ inferred that, if Matthews fell asleep as often as he claimed, he would not risk riding a bike or driving a car when he may hurt himself or others, and the record lacked evidence of treatment for any related falls or injuries to himself or to others. Yet Matthews may have made imprudent decisions in taking these risks and been fortunate to not cause any injuries to himself or to others.[4] The ALJ also inferred that Matthews would have been fired "well before" three months into his landscaping job if he slept so often. But she did not consider that Matthews's boss—his mother's best friend—may have been more tolerant. Finally, she noted that Matthews's providers' notes, including one that Ritalin helped for only a few hours before he became sleepy again, were inconsistent with his claim that he could stay awake only for one hour before again falling asleep. In either rendering, though, the Ritalin wore off quickly.

Our review of the ALJ's consideration of this entire record presents a close call. Indeed, at oral argument before us the Commissioner conceded that the record could be read differently than the ALJ did. Despite this parity, we cannot conclude that the ALJ's partially adverse credibility finding, overall, was "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (quoting *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)). Substantial evidence in this record supports the ALJ's conclusion that Matthews's complaints were not entirely consistent with the record. As discussed earlier, the ALJ credited every medical opinion in the record, including those of the agency consultants and testifying expert who found Matthews's reported symptoms to be only partially consistent with the record. Further, the providers' notes did not support Matthews's testimony that despite his medication he fell asleep several times a day, especially when he reported exercising and having active hobbies. And if his complaints were accurate, it is reasonable to infer that Matthews would have avoided driving and biking. So, the ALJ permissibly found that, rather than being "undisputed" as Matthews argues, his assertions regarding his napping—whether six times a day (as he testified) or once (as he now argues)—lacked credibility. We are to give the ALJ's credibility finding "special deference," *Summers*, 864 F.3d at 528, and Matthews's appeal

---

[4] Matthews now suggests he could schedule these sorts of activities around his sleepiness. But in the agency proceedings he said he can fall asleep at any given time and described unexpectedly passing out in the middle of activities, such as loading equipment in the landscaping truck.

to us to "reweigh the evidence or substitute our judgment for that of the [ALJ]" does not overcome it. *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018).

We do not read this record as the ALJ misunderstanding the nature of narcolepsy, or her failing to apprehend Matthews's condition. She did not conclude, for example, that Matthews was "inventing" his circumstances. The conclusion we draw is not that Matthews's condition is not real and significant, but that his case is one of degree, and on this record a failure of proof against the backdrop of our deferential review.

For these reasons, we AFFIRM the judgment.