In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2831

JENNIFER L. HOHMAN,

*Plaintiff-Appellant,*

*v.*

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:21-cv-59 — **James D. Peterson**, *Chief Judge.*

ARGUED MAY 24, 2023 — DECIDED JUNE 28, 2023

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Jennifer Hohman applied for Social Security benefits after she stopped working in April 2018. She suffers from fibromyalgia, post-traumatic stress disorder, depression, and anxiety, and she alleged that the combined effects of these conditions left her unable to work. Relying on testimony from a vocational expert, an administrative law judge denied the claim for benefits, finding that despite her limitations, Hohman still had the capacity to perform certain

jobs available in significant numbers in today's economy. Because the record contains substantial evidence supporting the ALJ's determination, we affirm.

## I

Since 1993 Hohman has regularly visited doctors and taken prescription medications to treat her anxiety and depression. She points to these impairments as the primary reason she can no longer work as a medical records clerk or patient access representative. She says that stress, which she frequently experiences upon interacting with others at work, triggers disabling levels of anxiety and depression not fully treatable with medication.

In 2013, when Hohman was 47, her doctors diagnosed her with fibromyalgia, a complex medical condition characterized by persistent, widespread pain. Hohman acknowledges that the treatment she has received for her fibromyalgia has generally proven effective, but she says that social stress and anxiety sometimes cause the pain to flare up, leaving her unable to work.

Hohman applied for disability benefits in May 2019. Following an evidentiary hearing in August 2020, the ALJ applied the five-step analysis outlined in 20 C.F.R. § 416.920 and concluded that Hohman was not disabled. Two aspects of the ALJ's analysis feature in this appeal: the determination of Hohman's residual functional capacity or RFC, and the step-five estimate of the number of jobs available that Hohman can perform.

The ALJ determined Hohman's RFC after considering the entire medical record, Hohman's daily activities, and her hearing testimony. In the ALJ's view, Hohman could perform

light work, which the Social Security Act's implementing regulations define as work that does not require lifting more than 20 pounds but does require walking and standing. See 20 C.F.R. § 404.1567(b). The ALJ imposed additional physical limitations (including occasional stooping and kneeling) and social limitations (performing tasks independently and only occasionally interacting with supervisors, coworkers, and the public). Based on this RFC, the ALJ found that Hohman could not perform her past work as a medical records clerk or patient access representative.

Proceeding to step five of the analysis, the ALJ considered whether Hohman's RFC allowed her to perform other jobs and whether those jobs were significantly available in the national economy. On this point, and as is common practice, the ALJ relied on the testimony of a vocational expert. The VE testified that someone with Hohman's RFC could work as a photocopy machine operator, small products assembler, or mail clerk. The VE then stated that these jobs exist in significant numbers nationwide, with an estimated 50,000 photocopy machine operator jobs, 40,000 small products assembler jobs, and 40,000 mail clerk jobs.

During cross-examination by Hohman's attorney, the VE elaborated on his methodology to arrive at these estimates. The VE first explained that he relied upon information provided by the Bureau of Labor Statistics in its Occupational Employment Statistics database, a source frequently used as a starting point by VEs in their application of the equal distribution method to estimate jobs in the national economy. We explained that method—and its shortcomings—at length in *Chavez v. Berryhill*, 895 F.3d 962, 969 (7th Cir. 2018). The VE here drew upon that source and from there modified the

results of the equal distribution approach to estimate the job numbers Hohman could work.

Even more specifically, the VE stated that he arrived at his final numbers through a "weighted estimate based upon [ ] professional experience, which contains over 25 years of both placement and labor market survey work, [including] 2,000 labor market surveys." The VE explained that many of those job titles in the database had been merged into one role or had been eliminated by technology, so he decided that each of the job titles should not receive equal weight. Within the category of jobs that includes mail clerks, for example, the VE explained that the database contained 14 total job titles that add up to 85,800 total jobs. But the number produced by dividing 85,800 by 14—the equal distribution method—did not accurately represent the number of mail clerk jobs in the national economy. Drawing on his familiarity with jobs in the mailing industry, the VE determined that mail clerks instead make up a larger share of the jobs in that group. So he arrived at an estimate of 40,000 mail clerk jobs. The VE also testified that he regularly consulted his colleagues to ensure his views accurately reflected labor market trends.

Hohman's attorney referenced our 2018 decision in *Chavez* and objected to the VE's testimony as too vague. The ALJ then asked the VE an additional question about his methodology, and the VE provided further information about the content of his labor-market surveys. Finding the answers satisfactory, the ALJ accepted the VE's testimony over Hohman's objection. The ALJ stated that the VE's expertise and reasoned explanations provided a sufficient basis to conclude the testimony was reliable, even though he did not provide an exact formula for his estimates.

The district court affirmed, and Hohman now seeks our review.

## II

Hohman first contends that the ALJ, in finding she could perform light work, failed to credit her testimony of pain and limitations she experiences from her fibromyalgia. Hohman believes the ALJ would have limited her to sedentary work had he credited her testimony.

The question before us is not whether Hohman suffers from pain related to fibromyalgia. Everyone agrees she does. Our task is limited to whether the ALJ sufficiently canvassed the record and appropriately weighed the evidence to determine the conditions, if any, that would allow Hohman to work given her illness. Our review, in short, is for substantial evidence—we reverse the ALJ's decision "only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quoting *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010)). And we review credibility determinations with even more deference—we reverse only those determinations that are "patently wrong." *Id.* at 789 (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)).

We have previously observed that disability claims rooted in the effects of fibromyalgia warrant careful attention given the nature of the illness. See *Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) (overturning an ALJ's credibility determination where "the ALJ's analysis reveal[ed] that he misunderstood the nature of [the claimant's] fibromyalgia pain"). The Social Security Administration also recognizes the complexity of fibromyalgia and the importance of subjective evidence in assessing a claimant's ability to work. See SSR 12-2P, 2012 WL

3104869. For example, when objective medical evidence conflicts with a claimant's description of the intensity or persistence of pain, an ALJ must consider all evidence in the record—such as the claimant's daily activities, medications, course of treatment, and statements by other people about the claimant's symptoms—before determining the credibility of a claimant's self-reported pain. See SSR 12-2P(IV)(B). ALJs must also take care to examine the claimant's treatment over time because fibromyalgia pain waxes and wanes. See SSR 12-2P(VI)(D) (explaining that ALJs must "consider a longitudinal record whenever possible" to assess fibromyalgia pain).

The ALJ applied the guidance in SSR 12-2P to arrive at the light-work RFC for Hohman. Rather than relying solely on objective medical evidence, the ALJ reviewed the entire record for information about Hohman's pain and how she has managed it over time. The ALJ pointed to evidence that since her diagnosis in 2013, Hohman has regularly walked her dog and performed other household activities without difficulty. She also continued working for five years until she quit her job in 2018. The ALJ further observed that Hohman's course of treatment has been conservative. For her part, Hohman testified that her medications effectively alleviated her pain symptoms, and the record lacked evidence that she had sought more aggressive treatment. Weighing these pieces of evidence against Hohman's subjective testimony, the ALJ found that Hohman could perform light work with certain social and physical limitations.

Hohman sees the ALJ's light-work RFC determination as "patently wrong." *Deborah M.*, 994 F.3d at 789. But we cannot agree: Hohman's testimony supports, and does not contradict, the ALJ's determination. Her emphasis on depression

and anxiety as the primary reasons she cannot work, and as the root cause of her fibromyalgia-related pain, underscores the ALJ's reliance on the record. By imposing social limitations—limiting her to jobs that do not require regular contact with supervisors or the public—the ALJ faithfully adopted Hohman's testimony to reflect her realistic capacity to work despite her impairments. This is substantial evidence supporting the ALJ's RFC determination, and Hohman cannot point to evidence that compels a different result.

## III

### A

Hohman next challenges the ALJ's reliance on the VE's testimony that there are a significant number of jobs available for her to work given her RFC.

In reviewing a VE's testimony, we ask whether substantial evidence supports the ALJ's reliance on that testimony, including whether the VE used a reliable methodology. See *Chavez*, 895 F.3d at 968. We consider "all features of the [VE's] testimony" to determine whether the testimony establishes "'more than a mere scintilla' of evidence supporting the ALJ's conclusion," keeping in mind that our determination is made "case-by-case." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1156–57 (2019).

A methodology is reliable when it is based on "well-accepted" sources and its steps are "cogently and thoroughly" explained. *Id.* at 1155. Establishing the reliability of a VE's job-number estimate "does not require meeting an overly exacting standard," as the "law recognizes and respects" the "realities and limitations" of calculating the number of jobs available for a claimant to work. *Chavez*, 895 F.3d at 968. The VE's

testimony need only "instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Brace v. Saul*, 970 F.3d 818, 822 (7th Cir. 2020) (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

## B

The ALJ found the VE's testimony to be supported by substantial evidence. So do we. The VE's approach aligns with the Supreme Court's guidance in *Biestek* and our observations in *Chavez*. We see no reason to disturb the ALJ's job-number findings.

We can readily trace the path of reasoning the VE used to arrive at the estimate of 40,000 mail clerk jobs. Instead of relying on the equal distribution method—a method whose shortcomings are well known—the VE made new estimates based on his "knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources [and] placing workers in jobs" over the course of his 25-year career. *Chavez*, 895 F.3d at 970. Just as we have encouraged, the VE here brought "his extensive experience to bear on the reality of those numbers," rather than "mechanically rel[y] on outdated sources" like the Bureau of Labor Statistics database, which was last updated in 1991. *Id.* In short, we have little difficulty following the VE's process, and we have no reason to question the reasonableness of the job numbers he approximated.

Hohman urges a different approach. In her view, the VE failed to show all his work, so his estimates cannot be supported by substantial evidence. On appeal, Hohman identifies specific questions that the VE left unanswered. She is unsure about which jobs the VE believed had been eliminated

by technology, for instance, and she does not precisely know the step-by-step calculations the VE performed to arrive at his final job-number estimates. Hohman effectively challenges the VE's modified application of the equal distribution method as too vague because she cannot recreate the job-number estimates herself.

But a VE's failure to provide exact data or calculations does not itself make the testimony unreliable. See *Biestek*, 139 S. Ct. at 1157. A VE's job-number estimate is "just that—an estimate." *Chavez*, 895 F.3d at 968. VEs, we have emphasized, "are neither required nor expected to administer their own surveys of employers to obtain a precise count of the number of positions that exist." *Id.* The VE here did not err in explaining his methodology in more general, non-precise terms.

Compare the VE's testimony in Hohman's case to that of the VEs in two cases we see as bookends on the substantial-evidence standard. At one end is *Fetting v. Kijakazi*, where a VE testified that his labor-market expertise from 30 years of experience in job placement informed the adjustments he made to numbers derived from the same Bureau of Labor Statistics database the VE used here. 62 F.4th 332 (7th Cir. 2019). We found those estimates supported by substantial evidence. See *id.* at 339.

On the other end is *Brace v. Saul*, where a VE testified only that he made an "allocation based upon weighting or re-weighting" to arrive at his estimates. 970 F.3d at 822. We held this testimony lacked evidentiary support because that VE disclaimed reliance on commonly used software and methods, and then failed to explain how his expertise informed his alternative "weighting" and "allocation" method. *Id.* We explained that a VE's experience and qualifications alone cannot

establish substantial evidence when he does not explain how that experience informs his methodology. See *id.*

The VE's testimony here is far closer to *Fetting* than it is to *Brace*. No doubt the VE could have explained his methodology with more clarity. But the VE "gave enough detail for us to understand the sources of his data and the general process he adopted." *Fetting*, 62 F.4th at 339. That is all the substantial evidence standard requires.

Hohman goes a bridge too far in suggesting that a VE must provide exact calculations to establish this modicum of confidence. We have never required VEs to meet such a standard, and we decline to do so today. A VE who, as here, provides a reasoned explanation based on hands-on experience working in the field, market surveys, or conversations with employers, can establish sufficient confidence in his job-number estimates even though the claimant may not be able to exactly duplicate them. See *Chavez*, 895 F.3d at 968 (recognizing that the "agency's regulations do not mandate a precise count of job numbers"). The law does not require the evidentiary precision Hohman seeks.

Notice what we are not saying. We are not saying that a VE's testimony passes the substantial-evidence threshold based on a VE's credentials or expertise alone. A federal court's review of an ALJ's decision "is case-by-case," and "takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record." *Biestek*, 139 S. Ct. at 1157. We see this holistic review reflected in the case law. Many VEs may testify to some type of "weighting" approach to their job-number estimates. In cases where a VE merely utters (or repeats) the word "weighting" without further explanation, such a reference may doom the

reliability of their testimony. See, *e.g.*, *Brace*, 970 F.3d at 822. But where a VE reasonably connects their "weighting" to their knowledge and experience, such as here and in *Fetting*, an ALJ can more readily see the logical bridge underlying the estimate.

A broader observation warrants emphasis. We have little doubt the source of much of Hohman's frustration is the equal distribution method. While we share many concerns about the method's reliability, we have never categorically barred VEs from using that method in social security disability hearings. It is not, by itself, reversible error for an ALJ to rely on the equal distribution method—in its purest form or modified to reflect a VE's experience—to make a step-five job-number determination.

\*       \*       \*

The party best positioned to devise a reliable approach to estimating job numbers at step five is the one that first promised to do so in 2008—the Commissioner of Social Security. See *Chavez*, 895 F.3d at 965. Fifteen years later, the agency still has not put a new system in place. What makes this problem frustrating for judges is that it is easy to imagine in today's data-driven world, detailed information about the national labor market exists and can feasibly be collected and used by ALJs in social security hearings. Until the agency follows through with its promise, ALJs will continue to rely on VE job-number estimates like the one that Jennifer Hohman challenges here to determine whether a claimant should receive, or be denied, disability benefits. We—and social security claimants nationwide—eagerly await an improved system.

With these closing observations, we AFFIRM.